IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

**JERRY LYNN LOFTON**
a/k/a **GERRY LYNN LOFTON**                                                             **PLAINTIFF**

v.                                                                                           No. 3:16CV211-MPM-JMV

**NURSE MELANIE EVERETT, ET AL.**                                                   **DEFENDANTS**

## MEMORANDUM OPINION

This matter comes before the court on the *pro se* prisoner complaint of Jerry Lynn Lofton, who challenges the conditions of his confinement under 42 U.S.C. § 1983. For the purposes of the Prison Litigation Reform Act, the court notes that the plaintiff was incarcerated when he filed this suit. The plaintiff has brought the instant case under 42 U.S.C. § 1983, which provides a federal cause of action against "[e]very person" who under color of state authority causes the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. The plaintiff, a pretrial detainee, alleges that the defendants failed to provide him with adequate medical care and used excessive force against him in violation of the guarantee of the rights of procedural and substantive due process under Fourteenth Amendment to the Constitution. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996).[1] The defendants have moved for summary judgment, and

---

[1] The Fifth Circuit has distinguished claims of pretrial detainees from those of convicts:

> Pretrial detainees and convicted prisoners are protected by different constitutional provisions regarding their respective rights to basic needs such as medical care and safety. The constitutional rights of a convicted state prisoner spring from the Eighth Amendment's prohibition on cruel and unusual punishment, *see Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), and, with a relatively limited reach, from substantive due process. The constitutional rights of a pretrial detainee, on the other hand, flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment. Significantly … the State must distinguish between

the plaintiff has responded to that motion. The matter is ripe for resolution. For the reasons set forth below, the motion by the defendants for summary judgment will be granted, and judgment will be entered in favor of the defendants.

## Summary Judgment Standard

Summary judgment is appropriate if the "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) and (c)(1). "The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden." *Beck v. Texas State Bd. of Dental Examiners*, 204 F.3d 629, 633 (5th Cir. 2000) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *cert. denied*, 484 U.S. 1066 (1988)). After a proper motion for summary judgment is made, the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Beck*, 204 F.3d at 633; *Allen v. Rapides Parish School Bd.*, 204 F.3d 619, 621 (5th Cir. 2000); *Ragas v. Tennessee Gas Pipeline Company*, 136 F.3d 455, 458 (5th Cir. 1998). Substantive law determines what is material. *Anderson*, 477 U.S. at 249. "Only disputes over facts that might affect the outcome of the suit under the

---

       pretrial detainees and convicted felons in one crucial respect: The State cannot
       punish a pretrial detainee.

*Hare v. City of Corinth, Miss.*, 74 F.3d 633, 639 (5th Cir. 1996)

governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*, at 248. If the non-movant sets forth specific facts in support of allegations essential to his claim, a genuine issue is presented. *Celotex*, 477 U.S. at 327. "Where the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 89 L. Ed. 2d 538 (1986); *Federal Savings and Loan, Inc. v. Krajl*, 968 F.2d 500, 503 (5th Cir. 1992).

The facts are reviewed drawing all reasonable inferences in favor of the non-moving party. *Allen*, 204 F.3d at 621; *PYCA Industries, Inc. v. Harrison County Waste Water Management Dist.*, 177 F.3d 351, 161 (5th Cir. 1999); *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187, 1198 (5th Cir. 1995). However, this is so only when there is "an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *see Edwards v. Your Credit, Inc.*, 148 F.3d 427, 432 (5th Cir. 1998). In the absence of proof, the court does not "assume that the nonmoving party could or would prove the necessary facts." *Little*, 37 F.3d at 1075 (emphasis omitted).

The very purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine issue for trial." Advisory Committee Note to the 1963 Amendments to Rule 56. Indeed, "[t]he amendment is not intended to derogate from the solemnity of the pleadings[;] [r]ather, it recognizes that despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary." *Id.* The non-moving party (the plaintiff in this case), must come forward with proof to support each element of his claim. The plaintiff cannot meet this burden with "some metaphysical doubt as to the material

facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986), "conclusory allegations," *Lujan v. National Wildlife Federation*, 497 U.S. 871, 871-73, 110 S.Ct. 3177, 3180 (1990), "unsubstantiated assertions," *Hopper v. Frank,* 16 F.3d 92 (5th Cir. 1994), or by a mere "scintilla" of evidence, *Davis v. Chevron U.S.A., Inc.,* 14 F.3d 1082 (5th Cir. 1994). It would undermine the purposes of summary judgment if a party could defeat such a motion simply by "replac[ing] conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188 (1990). In considering a motion for summary judgment, a court must determine whether the non-moving party's allegations are *plausible*. *Matsushita, supra*. (emphasis added). "[D]etermining whether a complaint states a plausible claim is context-specific, requiring the reviewing court to draw on its experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937 (2009) (discussing plausibility of claim as a requirement to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6)).

In considering a motion for summary judgment, once the court "has determined the relevant set of facts and drawn all inferences in favor of the nonmoving party *to the extent supportable by the record*, [the ultimate decision becomes] purely a question of law." *Scott v. Harris*, 550 U.S. 372, 381 (2007) (emphasis in original). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on the motion for summary judgment." *Id.* at 380.

## Undisputed Material Facts[2]

Mr. Lofton in this case has alleged facts supporting two distinct claims: (1) a claim for denial of medical care regarding a painful right knee from April 14, 2016, to April 17, 2016, and (2) a claim for use of excessive force on September 14, 2016. The court will discuss these events separately below.

## Denial of Adequate Medical Care

The following summary of events comports with the Mr. Lofton's contemporaneous medical records and incident reports.

| | |
|---|---|
| April 15 | Lofton "pushed his call button in cell" and asked to see the nurse, who saw him during med pass. Lofton complained of severe knee pain and requested pain medication. The nurse told Lofton that he had just finished three days of pain medication,[3] and he would have to purchase additional meds through the commissary. Later, Lofton again requested the nurse, and she returned to his cell where he complained of pain from leg injuries that occurred years ago. The nurse tried to examine Lofton by testing the range of motion of his knee, but he pushed her away, stating that the examination hurt him. The nurse told Lofton that she must first conduct an examination before he could see the doctor. Lofton refused to see the doctor; instead, he insisted on the pain medication. The nurse also told Lofton that a physician must examine him before prescribing pain medication, but Lofton also refused to visit the doctor. |
| April 16 | Lofton was taken to the medical room, and the nurse examined him. He stayed in the medical room for a time to undergo observation. |
| | Lofton then complained of numbness in his foot, and the nurse examined him again. Lofton again refused to see the jail's physician, Dr. Thompson. |

---

[2] In his response to the defendants' summary judgment motion, the plaintiff has noted where his allegations differ from those of the defendants, and the court will note those differences. None of the disputed facts, however, are material to the outcome of this case.

[3] Mr. Lofton notes that the only reference to those three days of pain medication is in the nurse's statement in his medical record. There is no separate documentation as there was for other times Lofton received medication. Mr. Lofton states that, in truth, he had last received pain medication over a month earlier, on March 12, 2016.

April 17    Lofton asked the nurse to check his blood pressure, and she went to his cell to do so. Lofton was uncooperative – and tossed a cup of urine near her as she tried to examine him.[4]

Later that day, Lofton finally agreed to see Dr. Thompson, who ordered that Lofton be taken to Baptist DeSoto Hospital for further evaluation. The doctor prescribed 800 mg of ibuprofen – as the nurse told him would happen if he would see the physician. He was treated that same day at the hospital, where the doctor drew fluid from his knee.

April 18    After returning to his cell, Lofton again asked to see the nurse, who again check on him.

April 19    Dr. Thompson prescribed Lofton Tylenol and prednisone.

Mr. Lofton's account of events is largely consistent with the facts set forth above, but with more detail. He states that the events began on April 14, 2016, rather than April 15, and that he could not walk due to the pain in his knee. He alleges that the nurse initially offered him one ibuprofen tablet for $3.00, the normal price for three tablets. Mr. Lofton alleges that he was in extreme pain, and the nurse should not have tried to bend his knee to conduct the range of motion test. He concedes that he jumped from the pain and "touched [the] nurse ever so gently" during the test. He also concedes that the nurse told him that, for a $10.00 copay, he could see the doctor, but she could not guarantee how long it would take for such a visit to occur. Mr. Lofton states that he "refused this offer because he was in great pain and he could not see himself waiting days for treatment." Lofton then alleges that the nurse placed him in an observation room for three days with no pain medication – and told other medical personnel not to dispense any medication to him. Mr. Lofton states that the nurse believed

---

[4] In his response to the instant motion, Mr. Lofton did not dispute that he threw a container filled with urine toward the nurse. Indeed, in his complaint and during the *Spears* hearing in this case, Mr. Lofton alleged that he had thrown urine (in either a cup or a chip bag) at the wall of his cell. Mr. Lofton did not mention the presence of the nurse in his account of that event.

that he was malingering. According to Mr. Lofton, the pain was so severe during this time that he contemplated suicide. He alleges that, after three days, "the doctor arrived an[d] administered ibupro[f]en (which greatly relieved the inflammation) and had [him] transported to the emergency room where large amounts of fluid were withdrawn from [his] knee." Medical records confirm that a doctor in the emergency room removed 40 ml of fluid from Mr. Lofton's knee.

In order to prevail on a claim for denial of medical care, a plaintiff must allege facts which demonstrate "deliberate indifference to the serious medical needs of prisoners [which] constitutes 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment . . . whether the indifference is manifested by prison doctors or prison guards in intentionally denying or delaying access to medical care . . . ." *Estelle v. Gamble*, 429 U.S. 97, 104-105, 50 L. Ed. 2d 251, 260 (1976); *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992). The test for establishing deliberate indifference is one of "subjective recklessness as used in the criminal law." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Under this standard, a state actor may not be held liable under 42 U.S.C. § 1983 unless plaintiff alleges facts which, if true, would establish that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 838. Only in exceptional circumstances may a court infer knowledge of substantial risk of serious harm by its obviousness. *Id.* Negligent conduct by prison officials does not rise to the level of a constitutional violation. *Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662 (1986), *Davidson v. Cannon*, 474 U.S. 344, 106 S.Ct. 668 (1986). This same subjective deliberate indifference standard has been applied to pre-trial detainees (such as Mr. Lofton) under the Fourteenth Amendment as well as convicted inmates under the Eighth Amendment. *See Hare v. City of Corinth*, 74 F.3d 633, 648 (5th

Cir. 1996). In cases such as this, arising from delayed medical attention rather than a clear denial of medical attention, a plaintiff must demonstrate that he suffered substantial harm resulting from the delay in order to state a claim for a civil rights violation. *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993); *Campbell v. McMillin*, 83 F. Supp. 2d 761 (S. D. Miss. 2000). A prisoner's mere disagreement with medical treatment provided by prison officials does not state a claim against the prison for violation of the Eighth Amendment by deliberate indifference to his serious medical needs. *Gibbs v. Grimmette*, 254 F.3d 545 (5th Cir. 2001), *Norton v. Dimazana*, 122 F.3d 286, 292 (5th Cir. 1997).

"Deliberate indifference is not established when medical records indicate that [the plaintiff] was afforded extensive medical care by prison officials." *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015). Nor is it established by a physician not accommodating a prisoner's requests in a manner he desired or the prisoner's disagreement with the treatment. *Id.*; *Miller v. Wayback House*, 253 F. App'x 399, 401 (5th Cir. 2007). To meet his burden in establishing deliberate indifference on the part of medical staff, the plaintiff "must show that [medical staff] refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Brauner*, 793 F.3d at 498.

Mr. Lofton's claims regarding denial of medical care do not rise to the level of deliberate indifference. First, he repeatedly refused the examinations and treatment offered him. He initially refused to permit the nurse to examine him. He then refused to continue with the examination of his knee (because it was painful). He repeatedly declined to visit the doctor – the only one who could prescribe medication and further treatment. When Mr. Lofton finally permitted the doctor to examine

him, he received ibuprofen and a transport to the hospital, where another doctor drew fluid from his knee. Further, Mr. Lofton alleges that the pain in his knee was so severe that he contemplated suicide; however, he declined to purchase pain medication from the commissary when told he could do so. A reasonable person suffering pain of the type Mr. Lofton describes would certainly take advantage of any pain or anti-inflammatory medication readily available at the jail commissary. Mr. Lofton did not.

By any rational measure, the delays Mr. Lofton experienced in receiving treatment for his painful knee arose out of his refusal to use the procedures in place to obtain medical care. Once he used those procedures, he received medical care that very day – including a trip to the emergency room. Despite Mr. Lofton's repeated refusals to be treated, jail medical personnel examined or treated him *nine times* during the three or four days at issue in this case, and he ultimately received additional treatment at the local hospital. Mr. Lofton's opinion regarding whether a range of motion test was necessary is simply his disagreement with the course of treatment provided, which does not rise to the level of deliberate indifference. This is clearly a case where the "medical records indicate that [the plaintiff] was afforded extensive medical care by prison officials," and Mr. Lofton has only himself to blame for the delay in his treatment. *Brauner v. Coody*, 793 F.3d 493, 500 (5th Cir. 2015). For these reasons, Mr. Lofton's claims regarding denial of medical treatment are without merit.

**Excessive Force**

On September 14, 2016, defendant Officer Kalon Hailey was on duty. The pod where Mr. Lofton was housed was a part of Defendant Hailey's watch on the night in question. After midnight, Hailey observed Mr. Lofton using the law library – and confronted him – as 10:00 p.m. is "lights out" at the jail, and Lofton should have been in his bunk. Hailey gave Lofton a warning, then returned to

duty. Later that night, after 1:00 a.m., Lofton was out of his bunk and asking for some legal papers to be notarized. Officer Hailey told Lofton that no other officer was present to perform this midnight notary service, and Lofton became upset, yelling, using profanity, and refusing to obey commands to step outside to be handcuffed.[5] Mr. Lofton's refusal to comply with the order led Hailey to call for backup. Due to Lofton's resistance and refusal to comply, multiple officers assisted in placing him on the wall and cuffing him. Lofton refused to walk on his own, and the officers placed him on the ground. Officers then lifted him off the ground and took him to a padded cell without incident.

For his part, Mr. Lofton admits that he "placed his hands on the wall and asked to see the supervisor *and refused to be taken to his cell*." ECF Doc. 63 at 11 (emphasis added). At this point, the officers Hailey had called "slammed [Lofton] into the wall then handcuffed him behind his back and ran him down the hall." *Id*. He then states that he stumbled, and the officers "slammed him to the floor[,] put their knees on his back[,] and put tasers to his neck," and told him they would tase him if he did not walk.

Mr. Lofton never filed a formal grievance regarding this incident; instead, he filed an "informal grievance," which was resolved when "Lt. Giles … came to the padded cell to speak with [Lofton]." When Mr. Lofton awoke the next day, he reported to an officer that someone in his pod had stolen his coffee. He did not allege that the guards used excessive force the night before or that he was injured. Mr. Lofton was extremely familiar with the jail's kiosk system, which he used frequently. Indeed, Mr. Lofton made heavy use of the kiosk during the time surrounding his criminal

---

[5] Mr. Lofton alleges that he turned around, put his hands on the wall, and demanded to speak to the shift supervisor – and, in doing so, refused to obey Hailey's order to return to his bunk. In his response, he does not dispute that he was also unruly.

trial (he represented himself in court). On September 15 (the day Lofton first reported that someone stole his coffee), he again reported that his coffee was stolen.

He used the kiosk to make a series of requests in the days following the incident giving rise to his claim for excessive force: September 15 (for copies to be made); September 16 (for something to be printed); September 17 (for a copy of court rules); September 18 (for forms); September 18 (to delay his dental evaluation); September 19 (for information regarding whether disabled inmates are required to pay for paid medication); and September 19 (to use the law library after 10:00). Again, in the requests filed during the five days following September 14, Mr. Lofton *never mentioned* the events of September 14, despite his many inquiries and interactions with jail staff and officials. Further, Mr. Lofton's medical records reflect that he saw a physician on September 9 – and had no problems walking. He next saw a doctor on October 27, 2016, more than six weeks after the events of September 14.

"[T]he Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473, 192 L. Ed. 2d 416 (2015) (citing *Graham v. Connor*, 490 U.S. 386, 395, n. 10, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). To state a claim of excessive force, a pretrial detainee must allege: (1) that the defendant had a "purposeful, knowing, or possibly a reckless state of mind" as to his "physical acts – *i.e.*, his state of mind with respect to the bringing about of certain physical consequences in the world," and (2) that the defendant's intentional actions in the physical world were *objectively unreasonable*. *Id.* at 2472. Put another way, the plaintiff must allege that the defendant knowingly or purposefully use force – and that the force was objectively unreasonable. *Id.* at 2473.

Objective reasonableness turns on the "facts and circumstances of each particular case," from the perspective of a reasonable officer at the scene, including what that officer knew at the time – and without the crystal clarity of hindsight. *Graham*, 490 U.S. at 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). The "management by a few guards of large numbers of prisoners" in a jail "may require and justify the occasional use of a degree of intentional force." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (citing *Johnson v. Glick*, 481 F.2d 1028 ($2^d$ Cir. 1973)). The court must also consider the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," deferring to "policies and practices that in th[e] judgment" of jail officials "are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 540, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Indeed, "[r]unning a [jail] is an inordinately difficult undertaking," *Turner v. Safley,* 482 U.S. 78, 84–85, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), and "safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Florence v. Board of Chosen Freeholders of County of Burlington*, 566 U.S. 318, 326, 132 S.Ct. 1510, 1515, 182 L.Ed.2d 566 (2012). Officers facing disturbances in a jail "are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving." *Graham*, 490 U.S., at 397, 109 S.Ct. 1865. A judge, who has ample time to reflect on the matter in the solitude of chambers, must be mindful of these considerations when deciding whether an officer's use of force was objectively reasonable.

Even in the absence of an expressed intent to punish, a pretrial detainee may nonetheless prove a claim of excessive force by showing that the guard's actions are not "rationally related to

a legitimate nonpunitive governmental purpose" or that the actions "appear excessive in relation to that purpose." *Bell*, 441 U.S. at 561, *see also Block v. Rutherford*, 468 U.S. 576, 585-586, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). In deciding whether the force used was objectively reasonable, the court may consider "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*. 135 S. Ct. at 2473. This list is not exhaustive, merely illustrative. *Id*.

In this case, Mr. Lofton repeatedly disobeyed the order of a jail guard to return to his bunk and stay there. The first time, he initially went back to his bunk, but later sneaked out again to use the kiosk after hours. When he was caught at the kiosk a second time, he refused to return to his bunk. When he continued his disobedience, other officers came, pushed him against the wall, cuffed him behind his back, and propelled him towards a padded cell. Mr. Lofton either stumbled or refused to cooperate, and the officers made very clear to him that he must walk the rest of the way to the padded cell. He did so. He never filed a formal grievance or a written complaint about injuries from the incident; nor did he seek medical care for such injuries. Nothing about this incident rises to the level of excessive force. As such, the claim is without substantive merit.

### Failure to Exhaust Administrative Remedies

As set forth above, Mr. Lofton's claims regarding excessive force are without substantive merit. In addition, they must be dismissed because he failed to exhaust his administrative remedies as to those claims. Congress enacted the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e *et seq.* – including its requirement that inmates exhaust their administrative

remedies prior to filing suit – in an effort to address the large number of prisoner complaints filed in federal courts. *See Jones v. Bock*, 549 U.S. 199, 202 (2007). Congress meant for the exhaustion requirement to be an effective tool to help weed out the frivolous claims from the colorable ones:

> Prisoner litigation continues to 'account for an outsized share of filings' in federal district courts. *Woodford v. Ngo*, 548 U.S. 81, 94, n. 4, 126 S.Ct. 2378 (2006) (slip op., at 12, n.4). In 2005, nearly 10 percent of all civil cases filed in federal courts nationwide were prisoner complaints challenging prison conditions or claiming civil rights violations. Most of these cases have no merit; many are frivolous. Our legal system, however, remains committed to guaranteeing that prisoner claims of illegal conduct by their custodians are fairly handled according to law. The challenge lies in ensuring that the flood of non-meritorious claims does not submerge and effectively preclude consideration of the allegations with merit. *See Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989).
>
> Congress addressed that challenge in the PLRA. What this country needs, Congress decided, is fewer and better prisoner suits. *See Porter v. Nussle*, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002) (PLRA intended to "reduce the quantity and improve the quality of prisoner suits"). To that end, Congress enacted a variety of reforms designed to filter out the bad claims and facilitate consideration of the good. Key among these was the requirement that inmates complaining about prison conditions exhaust prison grievance remedies before initiating a lawsuit.

*Jones v. Bock*, 549 U.S. 199, 203 (2007).

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §1997e(a), requires prisoners to exhaust any available administrative remedies prior to filing suit under 42 U.S.C. §1983. The exhaustion requirement protects administrative agency authority, promotes efficiency, and produces "a useful record for subsequent judicial consideration." *Woodford v. Ngo*, 548 U.S.81, 89 (2006). A prisoner cannot satisfy the exhaustion requirement "by filing an untimely or otherwise procedurally defective administrative grievance or appeal" because "proper exhaustion of administrative remedies is necessary." *Woodford v. Ngo*, 548 U.S. 81, 83-84 (2006); see also

*Johnson v. Ford*, 261 F. App'x 752, 755 (5th Cir. 2008)( the Fifth Circuit takes "a strict approach" to the PLRA's exhaustion requirement)(*citing Days v. Johnson*, 322 F.3d 863, 866 (5th Cir. 2003)); *Lane v. Harris Cty.Med.Dep't*, No. 06-20935, 2008 WL 116333, at *1 (5th Cir. Jan.11,2008)( under the PLRA, "the prisoner must not only pursue all available avenues of relief; he must also comply with all administrative deadlines and procedural rules"). Indeed, "a prisoner must now exhaust administrative remedies even where the relief sought – monetary damages – cannot be granted by the administrative process." *Booth v. Churner*, 532 U.S. 731, 739 (2001).

Though Officer Hailey was present during the incident, Mr. Lofton's allegations in his complaint do not squarely state that Hailey used excessive force. Likewise, Lofton does not allege that Hailey participated in pushing him against the wall, propelling him down the corridor, or taking him down to the floor. Similarly, Lofton states that defendant Jones was present, but did not touch him. The plaintiff alleges that defendant Free was present and participated in the incident, but was "not the main aggressor." ECF Doc. 1.

The requirement that claims be exhausted prior to the filing of a lawsuit is mandatory. *Gonzalez v. Seal*, 702 F.3d 785 (5th Cir. 2012). "Whether a prisoner has exhausted administrative remedies is a mixed question of law and fact." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010). As "exhaustion is a threshold issue that courts must address to determine whether litigation is being conducted in the right forum at the right time, . . . judges may resolve factual disputes concerning exhaustion without the participation of a jury." *Id*. at 272. The Supreme Court has also recognized the need for a prisoner to face a significant consequence for deviating from the prison grievance procedural rules:

> The benefits of exhaustion can be realized only if the prison grievance system is given
> a fair opportunity to consider the grievance. The prison grievance system will not
> have such an opportunity unless the grievance complies with the system's critical
> procedural rules. A prisoner who does not want to participate in the prison grievance
> system will have little incentive to comply with the system's procedural rules unless
> noncompliance carries a sanction . . . .

*Woodford* at 95.

The grievance process at the DeSoto County Adult Detention Facility is described in Policy 12.10 of the facility's Policies and Procedures. ECF Doc. 54-6 at 1. The first step of the grievance procedure is an *informal grievance*, which is normally filed verbally with the staff. If the complaint is not resolved at the officer level, a Shift Supervisor may review and address it. However, "[i]f the problem cannot be resolved through informal discussions or the inmate wishes to document the grievance for additional consideration, he may submit a written grievance to the grievance officer/board." ECF Doc. 54-6 at 2. This is a formal grievance, which a prisoner may pursue from filing, to initial resolution, to appeal, through final resolution. Policy 12.10 sets forth the process in detail. Mr. Lofton concedes that he did not move beyond the informal resolution phase of the grievance process. Thus, either he was satisfied with the result of the informal grievance process or he abandoned the grievance process at that point. Under either scenario, he did not exhaust the grievance process, and these claims must be dismissed for that reason.

**Other Claims**

Due to the general nature of Mr. Lofton's pleadings, the court permitted the case to proceed as to defendant Dustin Rowe; however, the defendants' brief makes clear, and the plaintiff does not dispute, that Mr. Rowe was not involved in the claims remaining in this case, and the claims against him will be dismissed. Similarly, the plaintiff has not alleged that defendant Sheriff Rasco personally

participated in either of the remaining claims, and *respondeat superior* is not a valid theory for recovery under 42 U.S.C. § 1983. *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978), *Woods v. Edwards*, 51 F.3d 577, 583 (5th Cir. 1995). Thus, the plaintiff's claims against Sheriff Rasco will also be dismissed. In addition, Mr. Lofton states in his response to the instant motion that he has made no claims regarding any in his official capacity, and any such claims described in the pleadings are dismissed.

## Conclusion

For the reasons set forth above, all of the plaintiff's claims in the instant case are either without substantive merit or remain unexhausted. As such, the instant motion by the defendants for summary judgment will be granted, and judgment will be entered for the defendants in all respects.

**SO ORDERED**, this, the 15th day of May, 2018.

/s/ **MICHAEL P. MILLS**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**